UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| GERALD CHOW and LILY CHOW, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> MARK J. ZIMNY and IVYADMIT ) <br> CONSULTING ASSOCIATES LLC, ) <br> ) <br> Defendants. ) | Civil Action No. _____ |

## COMPLAINT

Plaintiffs Gerald Chow ("Mr. Chow") and Lily Chow ("Mrs. Chow"), citizens of Hong Kong, bring this action against defendants Mark J. Zimny ("Zimny") and his company, IvyAdmit Consulting Associates LLC ("IvyAdmit"), to recover from defendants over two million dollars that the defendants obtained from Mr. and Mrs. Chow through fraudulent means under the guise of acting as educational consultants to and caretakers for the Chows' minor children while they attended private schools in the United States. Plaintiffs assert claims for fraud, breach of fiduciary duty, breach of contract, promissory estoppel, conversion, unjust enrichment, an accounting and imposition of a constructive trust.

### Parties

1.  Plaintiff Gerald Chow is a Chinese citizen who resides in Hong Kong. He is the husband of plaintiff Lily Chow and is the father of First Son and Second Son.

2.  Plaintiff Lily Chow is a Chinese citizen who resides principally in Hong Kong. She is the wife of Gerald Chow and is the mother of First Son and Second Son.

3. Defendant Mark J. Zimny is, upon information and belief, a citizen of Massachusetts who resides at either 7 Florence Street or 14 Watson Street, Cambridge, Massachusetts, and is a member and the founder of IvyAdmit Consulting Associates LLC.

4. Defendant IvyAdmit Consulting Associates LLC is a Connecticut limited liability company with an office in Cambridge, Massachusetts. IvyAdmit purports to be an educational consulting company. IvyAdmit transacts business in Massachusetts.

## Jurisdiction and Venue

5. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332, as the plaintiffs are citizens of a foreign state and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6. Venue in this District is proper pursuant to 28 U.S.C. § 1391, in that the defendants or their agents, or certain of them, reside or may be found here, a substantial part of the events giving rise to plaintiffs' claims occurred here, and the defendants transact business here.

## Facts

7. Gerald and Lily Chow have sought the best educational opportunities for their children. They decided in 2006 that their sons, First Son and Second Son, would benefit most by being educated in the top schools in the United States. Having no knowledge of the educational system in the United States, they engaged an educational consultant to assist them with the selection of appropriate middle schools in the United States and the admission process.

8. During the 2006-07 school year, First Son, then age 15, was a ninth grade student and boarded at Eaglebrook School in Deerfield, Massachusetts.

9. In June 2007, First Son graduated from Eaglebrook. At his graduation ceremony, Zimny approached Gerald Chow and introduced himself, stating that he was a professor at Harvard University and that he was at the graduation ceremony for one of First Son's classmates, a student from Korea and a relative of his Korean wife, Inny. Upon information and belief, Zimny's statement that he was a professor at Harvard University was false. Zimny was very friendly and told the Chows that he helped his relative, the Korean student, gain admission to Philips Andover, his "dream school." When he learned that the Chows lived in Hong Kong and had one son, First Son, in school in the States and another son, Second Son, planning to come to the United States for school, he informed them that he was planning to be in Hong Kong during the summer and that he would call on them while he was there.

10. During the summer of 2007, Zimny and the woman he had referred to as his wife met with Gerald and Lily Chow in Hong Kong and explained to them that he was an educational counselor. At that time, he offered his services to assist their children with their education in the United States. Zimny told the Chows that he owned a company called IvyAdmit through which he provided educational consulting services to Korean nationals who wished to have their children educated in the United States. He said he had high level connections with individuals in the development offices of New England boarding schools and Ivy League colleges and that if they engaged him as their educational consultant, he could use his school connections to assist them in gaining admission for First Son and Second Son to the top tier schools.

11. Zimny subsequently introduced the Chows in Boston to two Harvard professors whom he claimed were his partners, Professor Vivien Louie of the Harvard School of Education and Professor Gu-Yeon Wei of the Harvard School of Engineering and Applied Science. He

subsequently provided the Chows with a formal written "Plan" that described the services which IvyAdmit could provide for First Son and describing the benefits of engaging IvyAdmit.

12. In the Plan he prepared for First Son and presented to the Chows in the summer of 2007, Zimny claimed that Mr. and Mrs. Chow could benefit by contributions ("development process") made to schools which the boys wanted to attend, but only if those development funds were contributed through his Group, IvyAdmit. The Plan states in pertinent part:

> While the public appearance of any *quid pro quo* situation would be steadfastly denied by any University development official, the reality is that of course everything has a price. This begs the question, how do foreign families or corporations with distinct educational goals develop a productive and positive relationship with Universities through the process of development? The answer is simple: through intermediaries such as EDGE/IVY Group and the internal and long standing relationships these organizations have established within the embedded social networks of Universities like Harvard, Yale and Princeton.

The Plan went on to state that "the EDGE/IVY Group insiders are professionals who are well seasoned in the dynamics of how to create a mutually beneficial and reciprocal relationship through the development process." Upon information and belief, these statements were false and intended by Zimny to encourage Mr. and Mrs. Chow to provide him with significant funds that they believed would be used for the claimed purpose of making contributions to the development funds of certain schools.

13. Zimny also stated in the Plan that the top institutions were "very selective about where and from whom they will accept capital contributions," and that "none of the Tier 1 universities . . . will accept capital contributions from individuals or organizations that are unknown or untested to them . . . ." Zimny claimed that his organization had the expertise to utilize development and gifting effectively at U. S. boarding schools "in preparation for larger efforts at the University level." Upon information and belief, these statements were false.

4

14. In the Plan, Zimny claimed that because of "embedded racism," there is resistance among the schools from becoming "too friendly with Asian donors," and that there is "an unwritten presumption that donations are expected from full-pay foreign students." The Plan goes on to state that:

> Many of the foreign students are shunned, made fun of and treated as "second class" citizens at U.S. boarding schools due to their cultural differences, eating habits or other forces that make them 'different'. . . . They are viewed by many of the teachers and school officials as a 'necessary evil', e.g. students and families that are necessary for the health of the school because of their ability to contribute financially, but not welcomed to have a real 'seat at the table'. . . ."

Upon information and belief, these statements were false, and were intended by Zimny to induce Mr. and Mrs. Chow to engage him to protect and guide their sons while attending schools in the States.

15. Zimny proposed that, for $4,000 a month for each child, excluding tuition fees, boarding expenses for First Son, home stay expenses for Second Son and other development expenses that would be allotted to individual boarding schools to which the boys were applying, he/IvyAdmit would provide not only educational consulting services, but

- He would maintain regular communication with First Son and Second Son and be available to them 24 hours a day;

- He would provide them with access for support and tutoring to professors and graduates from the top universities who were working for IvyAdmit;

- He would meet with teachers, attend school functions and interact with guidance counselors to ensure that First Son and Second Son received diligent attention from their boarding schools and an appropriate strategy ultimately for gaining admission to the top universities;

- He would assist with living and other arrangements in the States and overseas for their summer education and activities; and

- He would develop and encourage an educational plan to assist First Son and Second Son in maximizing their academic performance.

5

He also represented that, through IvyAdmit, which was well known and well regarded by boarding schools and universities, he would be able to make development contributions to various schools in an appropriate manner which would likely assist in the admissions process.

16. The services Zimny promised, although expensive, were very attractive to Mr. and Mrs. Chow, as their young sons would spend much of each year in the United States, with which the Chows were very unfamiliar and where they had no connections, and Zimny, a person they had come to trust, promised to watch over their sons to ensure not only their educational success but also their safety and assimilation in the United States.

17. Accordingly, in return for the services that Zimny promised, in the summer of 2007, Mr. and Mrs. Chow commenced making payments of $4,000 a month for First Son and $4,000 a month for Second Son to IvyAdmit by wire transfer. Zimny represented to them that IvyAdmit would directly pay the school tuition bills, tutoring fees and living expenses for their sons and would then bill them for reimbursement of the amounts he advanced. Mr. and Mrs. Chow agreed to this arrangement.

18. Mr. and Mrs. Chow viewed Zimny as a trusted guardian for their sons while they were at school in the United States, and they placed their complete trust and confidence in him.

19. During the 2007-2008 school year, First Son, then age 16, boarded as a tenth grade student at Brooks School in North Andover, Massachusetts. The following school year, he was accepted at and attended the Buckingham Browne & Nichols School ("BB&N") in Cambridge, Massachusetts, to repeat his sophomore year. Second Son, then age 14, came to the United States in the summer of 2007 and enrolled as a day student in the eighth grade at Beaver Country Day School in Lexington, Massachusetts, residing in the home of the mother of one of

6

his tutors, which was arranged by Zimny. Second Son applied to and was accepted at Loomis Chaffee for the 2008-2009 school year as a ninth grade boarder.

20. During the 2007-2008 school year, Mr. and Mrs. Chow discussed with Zimny the future educational plans for their sons. Zimny repeatedly told them that the most selective boarding schools and private colleges in the United States were heavily focused on development: the strategic and systematic raising of money for programs, facilities, endowments and capital projects. He stated that the focus by these schools on development would create opportunities for their sons.

21. In early 2008, Zimny requested that the Chows provide funds to him to be used as contributions to the development funds at schools to which their sons would be applying for admission in the fall. He specifically requested that the Chows wire $75,000 to IvyAdmit in January 2008 and $80,000 in March 2008 for the stated purpose of his making contributions on their behalf.

22. In reliance on Zimny's claim that all development funds had to be contributed through him and his company, the Chows wired $75,000 on January 24, 2008 and $80,000 on March 12, 2008 in response to Zimny's request. Zimny did not specifically identify to which schools he intended to make the contributions on their behalf.

23. Upon information and belief, when Zimny requested the development funds from the Chows, he did not intend to contribute those funds to schools on their behalf, but rather he intended to and did convert those funds for his own use, without the Chows' knowledge.

24. In the summer of 2008, Zimny recommended to Mr. and Mrs. Chow that rather than paying him $4,000 a month for each child for his consulting services, they instead deposit with IvyAdmit a $1,000,000 retainer for First Son and a $1,000,000 retainer for Second Son.

7

Zimny represented that this $2 million retainer would be part of a big pool of money contributed by similar Asian, mainly Korean, families.  He stated that the purpose of this pool of money was to help their sons and daughters to gain admission to colleges of their choice in the United States.  Upon information and belief, these representations were false.

25. In the summer of 2008, Zimny also told Mr. and Mrs. Chow that he had significant expertise and success as an investor, he had enjoyed very significant investment returns and he would invest the $2,000,000 retainer and use the investment returns to pay the monthly consulting fees and the tutoring expenses for First Son and Second Son and make development contributions for them as appropriate.  He represented that when First Son and Second Son got into the colleges of their choice, he would repay the entire $1 million retainer paid for each child, together with any unspent investment gains and interest.  Tuition payments were not to be paid from the retainers; rather, IvyAdmit was to continue to make tuition payments directly and bill Mr. and Mrs. Chow for reimbursement.

26. Still trusting Zimny and believing that he was acting in good faith and in furtherance of their best interests and the interests of their children, Mr. and Mrs. Chow agreed to Zimny's proposal.  They wired IvyAdmit the $2 million over a period of several months in late 2008 and early 2009.  Zimny never disclosed to them how or where he was investing their money.

27. Upon information and belief, when Zimny requested that Mr. and Mrs. Chow provide him with $2 million as a retainer, he did not intend to invest those funds for their benefit, but instead, without the Chows' knowledge, intended to and did fraudulently convert those funds for his own use.

28.     Zimny recommended that First Son and Second Son attend an SAT preparatory course in Korea in the summers of 2008 and 2009, which they did. Zimny said that the 2008 summer expenses of tuition, boarding and supervision fees were included in the $2 million retainer fees. However, for the boys' 2009 summer expenses in Korea, Zimny stated that he would pay the tuition, room and board expenses directly and bill Mr. and Mrs. Chow for reimbursement. After payment, the Chows discovered that Zimny had charged them almost three times the actual tuition cost.

29.     During the summer of 2009, the relationship between Mr. and Mrs. Chow and Zimny began to deteriorate. Zimny insisted that all emails between their sons' schools and the Chows go through Zimny's personal email account. He told them that this was necessary because "he was responsible" for the children while they were attending those elite schools in the United States. Between June and early September 2009, Mr. and Mrs. Chow were unable to gain access to the email account. When access was finally restored, Mr. Chow learned that emails from both schools were missing during that period were missing from the email account.

30.     Shortly thereafter, Mr. Chow spoke to the headmaster at Loomis Chaffee where Second Son was a student. Mr. Chow asked the headmaster about a development contribution that Zimny had told him he had made on their behalf to the school. The headmaster responded that no such contribution had been received. When Mr. Chow mentioned to the headmaster that Zimny had represented that he was authorized by Loomis Chaffee to recruit students for the school, the headmaster denied any such authorization or affiliation with Zimny.

31.     In the fall of 2009, Zimny represented that a Korean person who had previously invested in his "closed fund" had backed out and that this created an "opportunity" for Mr. Chow to invest another $1 million in Zimny's closed fund. Mr. Chow declined the offer.

32. Thereafter, Zimny presented another request to Mr. Chow. In the fall of 2009, Zimny requested that Mr. Chow provide him with another $1 million for a development contribution to Stanford University. When Mr. Chow stated that he wanted to make the contribution in memory of his deceased mother, Zimny refused, stating that the $1 million contribution had to be made through him. As a result, Mr. Chow did not make the contribution.

33. In the fall of 2009, as a result of the foregoing as well as other issues that arose with Zimny, the relationship with Zimny completely broke down. Mr. and Mrs. Chow lost all trust in Zimny. Upon information and belief, Zimny, knowing that he would not be able to trick the Chows into providing any more funds to him, ceased providing any services to First Son and Second Son and all communications ceased.

34. On February 17, 2010, Mr. Chow wrote Zimny formally terminating their relationship and requesting the immediate return of the $2 million in retainers. He also requested that Zimny either identify the schools to which he made the contributions of $75,000 and $80,000 from the funds he had wired to him on January 24 and March 12, 2008, respectively, or, if the contributions had not been made, return the money.

35. On February 25, 2010, Zimny responded that he would not return the $2 million and he failed to provide any information concerning the $75,000 and $80,000 amounts which the Chows had wired to him in January and March 2008. In his lengthy email response, Zimny made a number of false accusations of wrongdoing against Gerald Chow and Lily Chow and made disparaging remarks against First Son and Second Son. Upon information and belief, the email was a threat by Zimny that he would make such false accusations and embarrass Gerald and Lily Chow and their children if they brought legal action to obtain a return of their funds.

## COUNT I
**(Fraud)**

36.     Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 35 above.

37.     Zimny, and through him IvyAdmit, made false statements and misrepresentations to Gerald and Lily Chow, as set forth above, concerning his intention to use the $2 million retainers for the benefit of their sons and to make development contributions to schools on their behalf.

38.     Plantiffs reasonably relied to their detriment upon Zimny's false statements and misrepresentations. As the intended, direct and proximate result thereof, they were harmed, and continue to suffer harm, for which Zimny and IvyAdmit are liable.

39.     Plaintiffs have been damaged by defendants' fraudulent representations and conduct in an amount in excess of $2,155,000, to be determined at trial.

## COUNT II
**(Breach of Fiduciary Duty)**

40.     Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 39 above.

41.     Gerald and Lily Chow reposed their trust and confidence in Zimny and IvyAdmit and entrusted them with $2 million of their money based upon Zimny's representations that he had expertise, would invest their money, would use the investment returns for the educational needs of their children, and would return the principal to them upon conclusion of his services. Further, Gerald and Lily Chow entrusted defendants with $155,000 for the specific purpose of making development contributions on their behalf.

42. Zimny and IvyAdmit were aware that Gerald and Lily Chow were reposing their trust and confidence in them and were relying on them with respect to the investment, use and return of their funds.

43. Zimny and IvyAdmit owed Gerald and Lily Chow a fiduciary duty by virtue of the trust and reliance that they placed in them and Zimny's knowledge and acceptance of such trust and reliance.

44. Zimny and IvyAdmit breached the fiduciary duty they owed to plaintiffs by failing and refusing to return the money entrusted to them and, upon information and belief, converting that money to their own use.

45. Plaintiffs have been damaged by Zimny's and IvyAdmit's breach of the fiduciary duty they owed to them in an amount in excess of $2,155,000, to be determined at trial.

## COUNT III
### (Breach of Contract)

46. Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 45 above.

47. Gerald and Lily Chow entered into an agreement with Zimny and IvyAdmit pursuant to which they agreed to entrust $2 million to them and Zimny and IvyAdmit agreed to invest those funds and use the investment returns to pay Zimny's and IvyAdmit's educational consulting fees and tutoring expenses for First Son and Second Son, and make development contributions to schools on their behalf. Defendants further agreed to return the principal and any remaining investment returns and interest to the Chows when their services were completed. In addition, Gerald and Lily Chow agreed to and did provide $155,000 in funds to Zimny and IvyAdmit for the purpose of using those funds to make development funds to certain schools.

48.     Zimny and IvyAdmit breached the agreement with plaintiffs by failing to use the funds provided in accordance with their agreement, failing to return the funds, and instead converting the funds to their own use.

49.     Plaintiffs have been damaged as a consequence of Zimny's and IvyAdmit's breach of contract in an amount in excess of $2,155,000, to be determined at trial.

## COUNT IV
### (Promissory Estoppel)

50.     Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 49 above.

51.     Zimny and IvyAdmit induced Gerald and Lily Chow to deposit $2 million dollars with them based upon Zimny's representation that they would invest the proceeds, use the investment returns to pay Zimny's and IvyAdmit's educational consulting fees and tutoring expenses for the Chows' children, make development contributions to schools on their behalf and return the principal and remaining investment returns to the Chows when their services were completed.  Further, Zimny and IvyAdmit induced the Chows to provide $155,000 to them based upon Zimny's representation that the funds would be used to make development contributions to schools for the benefit of the Chows' children.

52.     In providing the foregoing funds to Zimny and IvyAdmit, the Chows reasonably relied upon Zimny's promises to their significant detriment.

53.     As a consequence of their reasonable reliance on Zimny's and IvyAdmit's promises, the Chows have been damaged in an amount in excess of $2,155,000, to be determined at trial.

## COUNT V
**(Conversion)**

54. Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 53 above.

55. Zimny and IvyAdmit, without right or permission from Gerald and Lily Chow, improperly exercised control over and converted for their own use the funds that the Chows entrusted to them for specific purposes.

56. The Chows are entitled to the immediate return of these funds.

## COUNT VI
**(Unjust Enrichment)**

57. The Chows reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 56 above.

58. Zimny and IvyAdmit have been unjustly enriched by the amounts that Gerald and Lily Chow provided to them which Zimny and IvyAdmit have refused and failed to return.

59. Defendants in equity and good conscience should pay to plaintiffs as a result of defendants' unjust enrichment an amount in excess of $2,155,000, to be determined at trial.

## COUNT VII
**(For An Accounting)**

60. Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 59 above.

61. Defendants failed to use the proceeds provided to them by plaintiffs for their intended purposes, and overcharged plaintiffs for reimbursements for certain tuition payments. Defendants have failed and refused to account to plaintiffs for the use of the funds transmitted to them by plaintiffs.

62.     Plaintiffs demand and are entitled to a full accounting from defendants identifying how and where the $2,155,000 in funds provided to them were invested and or spent or contributed, as well as an accounting of the actual cost of all items for which defendants sought and obtained reimbursement from plaintiffs.

## COUNT VIII
### (Constructive Trust)

63.     Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 62 above.

64.     Gerald and Lily Chow reposed their trust and confidence in Zimny and IvyAdmit and entrusted them with $2 million of their money based upon Zimny's false representations that he had expertise, would invest their money, would use the investment returns for the educational needs of their children, and would return the principal to them upon conclusion of his services. Further, Gerald and Lily Chow entrusted the defendants with $155,000 based upon Zimny's false representation that the funds would be used to make development contributions on their behalf.

65.     Zimny and IvyAdmit obtained the foregoing funds from Gerald and Lily Chow fraudulently, and once they obtained the funds they converted them to their own use in breach of the fiduciary duty that they owed to Gerald and Lily Chow.

66.     A constructive trust for the benefit of Gerald and Lily Chow should be imposed on Zimny and IvyAdmit with regard to the $2 million and $155,000 of funds entrusted to them by Gerald and Lily Chow, in order to prevent unjust enrichment.

## **PRAYERS FOR RELIEF**

WHEREFORE, plaintiffs Gerald and Lily Chow pray that this Court:

1. Enter judgment in their favor and against the defendants on all Counts of the Complaint;

2. Award plaintiffs all damages they sustained as a result of defendants' conduct pursuant to Counts I - VI, including without limitation an amount equal to the $2,155,000 plaintiffs provided to defendants;

3. Enter an Order requiring the defendants to provide an accounting pursuant to Count VII;

4. Order that $2,155,000 provided by plaintiffs to defendants be held in a constructive trust pursuant to Count VIII pending return to plaintiffs;

5. Award plaintiffs their attorneys' fees, costs and pre-and post-judgment interest; and

6. Grant such further relief as this Court deems just and proper.

                              **GERALD CHOW and LILY CHOW,**

                              By their attorneys,

                              __"/s/" Marjorie Sommer Cooke_____
                              Marjorie Sommer Cooke (BBO # 097800)
                              mcooke@ccg-law.com
                              Kevin W. Clancy (BBO # 552590)
                              kclancy@ccg-law.com
                              COOKE CLANCY & GRUENTHAL LLP
                              265 Franklin Street
                              Boston, MA 02110
                              (617) 428-6800
                              (617) 428-6868 (fax)

Dated: April 5, 2010