UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                )
GERALD CHOW AND LILY CHOW,     )
                                                )
    Plaintiffs                           )
                                                )   Civ. No. 1:10-CV-10572-GAO
    *v.*                                    )
                                                )
MARK J. ZIMNY and IVY ADMIT     )
CONSULTING ASSOCIATES LLC,      )
                                                )
    Defendants                         )
_____)

## **DEFENDANT MARK ZIMNY'S MOTION TO DISMISS**

The defendant Mark Zimny (Zimny) moves for dismissal of the plaintiffs' Complaint under Federal Rules of Civil Procedure 9 and 12.

### **Factual Background**

### *The Complaint*

The following facts are taken from the Complaint. Zimny denies many or most of the facts alleged by the plaintiffs, but solely for purposes of applying the Rule 12 dismissal standard Zimny cites to the following factual scenario averred in the Complaint for purposes of this dismissal Motion.

The plaintiffs (the Chows) are Hong Kong nationals of some means with two sons, denominated in the Complaint as First and Second Son, respectively. Complaint ¶¶1, 2, 7, 26. The Chows sent their Sons to be educated at middle and secondary schools in New England. In June 2007, during First Son's middle school graduation, the Chows briefly met Zimny who was also present at the graduation. This was a random encounter; the Chows and Zimny not being alleged to have had any preexisting relationship.

Complaint ¶9. Sometime during the "summer" (2007), they met again, this time in Hong Kong. Complaint ¶10. Zimny is alleged to have told the Chows that his company, co-defendant Ivy Admit, was an educational consulting service which, if hired, could assist Sons with gaining admission to elite schools in the United States. Complaint ¶10  There appears to have been a third meeting at some other date and time (the summer?), during which Zimny introduced the Chows to two Harvard professors, claiming them to be his business partners in a college preparatory/consulting business (the co-defendant, Ivy Admit). Complaint ¶11.  At another uncertain date/time (again, summer) a formal written "Plan" was presented to the Chows essentially spelling out how Zimny and Ivy Admit could get First Son into an elite prep school. Complaint ¶¶11 – 12.  The Chows claim the Plan (a copy of which is not attached to the Complaint) was a fraud they succumbed to. Complaint ¶¶12 – 14.

      The Plan was supposedly tailored to the needs of First Son. But the only sections of the Plan quoted at length in the Complaint make no reference to First or Second Son or the Chows.  These excerpts consist of generalized expository observations relating opinions of how one might gain a competitive edge when seeking admission to a university and the experiences of foreign students at boarding schools. Complaint ¶¶12 - 14.

      Although Zimny was unknown to them prior to their sporadic meetings in the summer of 2007, the Chows at some point (again, the summer of 2007) began paying Ivy Admit thousands of dollars on a regular basis so that Zimny and/or Ivy Admit would act as tutors/academic advisors/surrogate parents in the United States for Sons while they went to prep schools in New England. Complaint ¶¶15 - 17.  The Chows aver that Zimny,

basically a stranger, was immediately (and inexplicably) viewed by them as "as a trusted guardian for their sons" and that the Chows placed their "complete trust and confidence in him." Complaint ¶18.

First Son boarded at the Brooks School in North Andover, MA (2007 – 2008) and then attended the Buckingham Browne and Nichols School (BBN) in Cambridge, MA to repeat his sophomore year (2008 – 2009).  Second Son attended the eighth grade at Beaver Country Day School (the Complaint states in Lexington, MA but the School is in Chestnut Hill, MA) (2007 – 2008) and the ninth grade at the Loomis Chaffee School in Windsor, CT (2008 – 2009). Complaint ¶19.

The Chows made payments to Ivy Admit of $75,000 (January 2008) and $80,000 (March 2008), based on a "request" from Zimny, for the "stated purpose" of later using these funds as contributions to unnamed/unknown schools (assumedly to enhance the marketability of Sons for purposes of admission). Complaint ¶¶21 – 23.  The Chows allege that in paying this money they relied on Zimny's claim that any contributions to the schools would have to be made through Zimny and Ivy Admit. Complaint ¶22.  The bottom line seems to be Zimny asked the Chows for $155,000 and the Chows paid that amount to Ivy Admit.  The Chows further aver it is their belief the money paid was never given to unnamed schools.  Complaint ¶¶22 - 23.

At some point in 2008 (the summer), Zimny suggested that rather than continuing to make periodic payments to Ivy Admit for services for Sons for years to come, the Chows pay Ivy Admit a flat fee of one million dollars for each Son, for a total of two million dollars. It is alleged Zimny falsely described this two million dollar payment as part of a "big pool of money" from Asian donors to "help their sons and daughters to gain

3

admission to colleges of their choice". Complaint ¶24. In 2008 Zimny also allegedly boasted to the Chows of his prowess as an investor. Somehow, it is alleged, the Chows believed Zimny's supposed claim he could invest the two million dollars so successfully that income would be generated to pay all ongoing Ivy Admit charges, tutoring charges, make development contributions to colleges, and then quite remarkably return the two million dollars back to the Chows with "any unspent investment gains and interest", this complete refund to occur (and impliedly the defendants' services to conclude) once "First Son and Second Son got into the colleges of their choice." Complaint ¶25. As a matter of math and of age, that triggering event would occur at the earliest (for both Sons) several years in the future.

  This extraordinary agreement as alleged by the Chows was the proverbial too good to be true deal.  Not only would Ivy Admit pay for its fees and for tutoring charges incurred by First and Second Sons from the two million dollars, but also sizeable contributions to colleges would be made and all the money would be returned with a possible profit. The alleged agreement is not said to have been reduced to writing, nor is any writing attached to the Complaint memorializing this purported agreement.

  In late 2008 and early 2009 the Chows paid a total of two million dollars to Ivy Admit. Complaint ¶27.  The Chows demanded their money back after their relationship with Zimny began to deteriorate at some point (the summer) in 2009. Complaint ¶29. The Chows suggest Zimny blocked their access to an email account, marked up the actual cost of outside tutoring for First and Second sons in Korea in 2008 and 2009, did not make a contribution to Loomis Chaffee that Zimny had referred to at some earlier time, lied about being an authorized to recruit students for Loomis Chaffee, and twice asked

4

them for an additional million dollars which the Chows refused to provide. By the fall of 2009 the Chows "lost all trust in Zimny". Complaint ¶¶29 - 33.  In February 2010 the Chows demanded the return of their two million dollars and the previously paid $155,000.  Zimny promptly refused, leveling a variety of charges against the Chows in a reply email which the Chows claim to be false and the Chows do not further recount in the Complaint. Complaint ¶35.

From this confusing factual adumbration the Chows assert myriad claims for relief. Their claims fail as a matter of law on the face of the Complaint.

### Argument

*The Complaint should be dismissed under Fed. R. Civ. P. 9(b) and 12(b)(6) for the plaintiffs' failure to plead their fraud case with requisite particularity and their failure to present a comprehensible claim of liability.*

1. **The Complaint as a whole fails to plead fraud with specificity as required by Fed. R. Civ. P. 9 (b) and does not meet the more stringent standard of review under Fed. R. Civ. 12 (b) (6) adopted by the Supreme Court in 2007.**

In 2007 the Supreme Court adopted a more exacting benchmark for assessing a complaint's viability under Rule 12 than had heretofore been employed in the modern era of Rules pleading. *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964 - 1969 (2007).  Under the *Twombly* standard, the pleader cannot rely on a host of conclusory allegations in a complaint, but must articulate facts in sufficient detail to allow a court to pass on the sufficiency of the complaint as a legal claim for relief. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions." *Bell Atlantic Corp.* v. *Twombly*, at 1964 – 1965.  Plaintiff's Complaint is devoid of factual support and does not meet this threshold for pleading under Rule 12.  The agreements between the parties are described in nebulous terms;

asserted misrepresentations are described in the most general of terms (e.g., taking place in the "summer") and it is apparent from the Complaint that the intended outcome sought by the Chows in their dealings with the defendants was far more aspirational than definite.

Similarly, the Complaint also violates Rule 9(b)'s precept that it should provide detail to adequately inform the defendants the nature of claims of fraud or grounded in fraud. Under this standard:

> The particularity requirement means that a complaint must specify "the time, place, and content of an alleged false representation." *Doyle v. Hasbro, Inc.,* 103 F.3d 186, 194 (1st Cir.1996) (quoting *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 228 (1st Cir.1980), *superseded by statute on other grounds,* Private Securities Litigation Reform Act of 1995, Pub.L. No. 104-67, 109 Stat. 737). Conclusory allegations and references to "plans and schemes" are not sufficient. *Id.* (quoting *Hayduk v. Lanna,* 775 F.2d 441, 444 (1st Cir.1985)).

-- *United States ex rel. Rost v. Pfizer*, 507 F.3d 720, 731 (1st Cir. 2005).

Moreover, facts must be averred that establish what the fraud was, or why a falsehood was, as alleged, false. The Complaint must contain "factual or statistical evidence to strengthen the inference of fraud beyond possibility." *Rost*, 507 F.3d at 733.

In their Complaint the Chows assert they reposed their trust in Zimny under circumstances which were manifestly unreasonable. Moreover, other than repeated vague references to, for example, the summer, they cannot specify the who, what, when and where of Zimny's assertions they claim to be fraudulent, how those assertions were fraudulent, or how it is they could have reasonably relied on the Zimny's assertions given their limited dealings with him, who they alternately seem to characterize as either trusted guardian or arms-length investment/school admissions guru and conduit for prep school/college contributions.

6

Critical factual gaps abound in the Complaint. What was it specifically that led the Chows to conclude that Zimny lied about being a Harvard professor? How do the Chows conclude that Zimny improperly converted funds to his own use? What facts can they advert to support their conclusory allegations of a vast fraud being perpetrated on them by the defendants? Well pled facts answering these pivotal questions are absent from the Complaint.

The Chows are displeased with Zimny and they want their money back. But this in itself does not present a claim for relief, and their Complaint, as framed, should be dismissed.

**2. The Chows' claims for Fraud (Count I), Breach of Fiduciary Duty (Count II), Promissory Estoppel (Count IV), and the derivative claims of Unjust Enrichment (Count VI), Accounting (Count VII) and Constructive Trust (Count VIII) fail as they do not adduce pled facts showing reliance on Zimny's statements would have been reasonable.**

In order to plead cognizable claims for relief under the rubrics of fraud, breach of fiduciary duty and promissory estoppel and their derivatives, the Chows must show that any reliance they claim to have made on the defendants or their statements was reasonable. *Rodi* v. *Southern New England School of Law*, 532 F. 3d 11, 16 - 18 (2008) (analyzing claim for fraudulent misrepresentation). The Chows cannot repose confidence in the defendants and later to claim such a subjective belief was actionable if they did so "improvidently and unreasonably". *Rodi*, 532 F. 3d at 18. *See also Armstrong* v. *Rohm and Haas Co., Inc.*, 349 F. Supp. 2d 71, 81 (D. Mass. 2004) (unreasonable for plaintiffs to have relied on allegedly fraudulent promise by defendant to "provide all the work they could handle" where this was unduly vague and not an enforceable contract).

This requirement that reliance be objectively reasonable also applies to the estoppel claim, *Thornton* v. *Harvard University,* 2 F. Supp. 2d 89, 94 – 95 (D. Mass. 1998), as well as the breach of fiduciary duty claim. *See International Strategies Group, Ltd. v. Greenberg Traurig, LLP*, 482 F. 3d 1, 11 (1st Cir. 2007) (no reasonable reliance shown in support of breach of fiduciary duty claim where plaintiff claimed it reposed trust in attorney representing a third party to retrieve funds on its behalf as well); *Sheinkopf v. Stone,* 927 F.2d 1259, 1266-67 (1st Cir.1991) (no reasonable reliance by plaintiff using attorney for investment services). *Compare Spinner* v. *Nutt*, 417 Mass. 549, 552 – 555 (1994) (attorneys for trustees owed no duty to trust beneficiaries).

Similarly, to adequately plead unjust enrichment, accounting and constructive trust, the Chows must first sufficiently plead wrongful conduct by the defendants (such as fraud) which would give rise to these equitable forms of relief. *See Maffei* v. *Roman Catholic Archbishop of Boston*, 449 Mass. 235, 246 – 247 (2007) (reviewing and applying principles of constructive trust); *Northrup* v. *Brigham*, 63 Mass. App. Ct. 362, 370 (2005) (constructive trust is remedy imposed to avoid unjust enrichment; no support for plaintiff's claim).

From the averred facts the Chows barely knew Zimny, yet they unreasonably and improvidently claim to have reposed great confidence and trust in him. The scenario conveyed by the Chows is not of a fiduciary relationship but of an arrangement arguably much more pragmatic in its nature and purpose.

The Chows clearly believed that by paying vast sums of money to Ivy Admit, this would facilitate the admission of Sons into elite prep schools whether Sons had bona fide qualifications for such schools or not. And indeed, whether by dint of Sons'

qualifications or otherwise, Sons ultimately were admitted to BBN and Loomis Chaffee. The Chows cannot grieve they knowingly engaged in what they outline to have been a pay to play enterprise, then later complain they were unsuspecting naifs led astray by Zimny or Ivy Admit.  The dicey undertaking the Chows describe participating in was obviously fraught with pitfalls. The remarkably loose nature of their alleged arrangement with the defendants – whatever it truly was, and from all that appears from the Complaint it consisted of the Chows wiring large sums to Ivy Admit between 2007 and 2009 – could not have created any reasonable expectation of a definite return of any sort on the part of the Chows. The facts presented do not square with a claim sounding in any sort of fiduciary obligation.

Additionally, the Chows are unable to articulate what the bargain they struck with Zimny or Ivy Admit was with enough clarity or definiteness to give rise to an actionable claim.  Instead they describe a $155,000 payment to Ivy Admit at Zimny's "request" which they now want returned and a two million dollar payment to Ivy Admit as a flat fee for support services and tutoring payments for Sons and undefined contributions to unnamed colleges. All the while the Chows contend they believed the two million dollars would substantially appreciate as an investment in some unspecified way when they were paying Ivy Admit this amount during late 2008 – early 2009.

The Chows' Complaint fails to recognize that common law counts do not serve as an insurance policy for poor judgment, avarice, or any other of many human failings. Their Complaint should be dismissed.

> **3. All of the Counts in the Complaint fail as they are grounded on the premise there was an unwritten agreement in violation of the Statute of Frauds between the plaintiffs and defendants which would not be performed within a year.**

The gist of the vaguely defined agreement described by the Chows seems to be that the defendants would provide consulting services to the Chows to facilitate the admission of Sons into top tier prep schools and colleges. In particular, the largest payment to Ivy Admit made by the Chows (two million dollars, the bulk of their claim against the defendants) was allegedly to be used for purposes of gaining Sons' admission to colleges of their choice, after which the agreement would be deemed performed and the two million dollars was supposedly to be refunded to the Chows. The full performance of this asserted agreement – the Sons' admission to the colleges of their choice which would trigger the return of the two million dollars to the Chows – could not occur for years to come. The Chows now demand their two million dollars back. Sons have not been admitted to the colleges of their choice nor will they even be in a position to apply to college for several years. This is precisely the sort of novel understanding which is subject to the writing requirement in the Statute of Frauds.

> Under the Statute:
>
> No action shall be brought…Upon an agreement that is not to be performed within one year of the making thereof…unless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized.
> -- G. L. c. 259, §1.

The Statute applies to cases such as the one at bar where the asserted contract will not be fully performed within one year of its making. *Tucker v. Smith*, 395 Mass. 648, 650 (1985) (broker could not claim commission under verbal agreement based on lease

payments over period of years).  With regard to the two million dollars, the Chows do not claim there is a written, signed agreement documenting the deal they supposedly struck with the defendants.  For all the large amounts of money being wired to Ivy Admit, a curious aspect of the Complaint is the lack of references to a written agreement(s). The alleged Plan for First Son is alluded to, but the Plan is not described as a signed instrument and a copy of the Plan is curiously absent from the Complaint.

The Chows' claims in the Complaint arise from their verbal understandings with Zimny, and the almost all of the damages they seek in particular are based upon the two million dollar agreement they describe as being incapable of full performance within one year. The Complaint fails under the Statute of Frauds and should be dismissed.

4. **The Chows' claims for Breach of Contract (Count III), Promissory Estoppel (Count IV), Conversion (Count V) and derivative claims all fail as they are based upon an alleged agreement which had impermissibly indefinite terms and, with respect to the return of the two million dollars, a condition precedent (the enrollment of the Sons at the colleges of their choice) was set was not fulfilled.**

For the Chows to prevail on their claims sounding in contract, estoppel and conversion, they have to plead enough facts to demonstrate concretely defined rights under an agreement with the defendants such that the Chows are plainly due their total of $2,155,000 back.  However, the contractual skein running through the Complaint is one of equivocation and indefiniteness.  Zimny allegedly "requested" money for Ivy Admit, to be used later as donations of an uncertain amount to unnamed schools at an undefined time.  Zimny "recommended" the Chows pay Ivy Admit two million dollars for vaguely defined consulting services, undetermined contributions to unidentified colleges and use in unnamed investments. Such exchanges did not provide the basis for a fully formed contractual obligation cognizable at law. "[T[he law is well-settled that the essential

terms of a contract must be definite enough to ascertain the nature and extent of the parties' obligations." *Hutchins* v. *Zoll Medical Corporation*, 430 F. Supp. 2d 24, 34 (D. Mass. 2006). *See also Armstrong*, 349 F. Supp. 2d at 81.  The Chows did not have an actionable agreement with Zimny with clearly defined mutual obligations and terms.

With regard to the Chows' demand for repayment of the two million dollars, according to their rendering of the facts, this money was not to be returned to them until "First Son and Second Son got into the colleges of their choice". Such a triggering event operated as a condition precedent for the return of the money to the Chows. *Twin Fires Investment, LLC* v. *Morgan Stanley Dean Witter & Co.,* 445 Mass. 411, 420 – 421 (2005) (condition precedent barred contract action but damages awarded on reliance claim). This condition has not been met.  Accordingly, the defendants cannot be sued for breach of contract (Count III) or for conversion (Count V) or derivative claims such as Unjust Enrichment (Count VI) Accounting (Count VII) and Constructive Trust (Count VIII) where (under the Chows' version of events) the event which would trigger the obligation to return the two million dollars to the Chows has not occurred.

**5. Where Zimny was acting for Ivy Admit and the Chows only allege they made payments to Ivy Admit, they have no claim against Zimny individually.**

The Chows do not appear to claim their payments were made to Zimny personally,. Instead, the Complaint depicts Zimny as acting for Ivy Admit, and all payments were made to Ivy Admit. Although there was no question that the Chows knew Zimny was acting for and the Chows were making payments to a corporation (Ivy Admit), the Chows have sued Zimny personally, claiming he is individually liable to them.

> To support this contention, plaintiff must meet a very high standard. *American Home Assurance Company v. Sport Maska, Inc*., 808 F.Supp. 67, 73 (D.Mass.1992). Under Massachusetts law, disregarding separate corporate entities is the exception, not the rule. *Dale v. H.B. Smith Co., Inc.*, 910 F.Supp. 14, 18 (D.Mass.1995). Piercing the corporate veil is permitted only (1) where one corporation actively and directly participates in the activities of the second corporation, apparently exercising pervasive control, and there is some fraudulent or injurious consequence of the intercorporate relationship, or (2) there is a confused intermingling between corporate entities engaged in a common enterprise. *My Bread Baking Co. v. Cumberland Farms, Inc., et al.*, 353 Mass. 614, 618-19, 233 N.E.2d 748 (1968).
>
> -- *Hiller Cranberry Products, Inc.* v. *Koplovsky Foods, Inc.,* 2 F. Supp. 2d 157, 161 (D. Mass. 1998); *see also Evans* v. *Multicon Construction Corp.*, 30 Mass. App. Ct. 728, 736 – 738 (1991).

The Chows do not plead any facts suggesting they were ever confused about who they were paying, i.e., Ivy Admit.  They do not aver any particular facts suggesting that Ivy Admit's corporate form should be disregarded in favor of asserting personal liability against Zimny.  Without pleading such facts as required under Massachusetts law, the Chows have no personal claim against Zimny. *See Evans,* 30 Mass. App. Ct. at 733, describing 12 factors for disregarding corporate form analyzed in *Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc*., 754 F.2d 10, 14-16 (1st Cir.1985).  The Chows' claims against Zimny should be dismissed.

**Conclusion**

Based on the foregoing reasons, the Complaint in this case should be dismissed.

                                        Respectfully Submitted,
                                        MARK ZIMNY
                                        By his attorney,

                                        /s/ John D. Fitzpatrick
                                        John D. Fitzpatrick, Esq., BBO#550059
                                        Pingitore & Fitzpatrick, LLC
                                        929 Massachusetts Avenue, Suite 103
                                        Cambridge, Massachusetts 02139
                                        Phone: (617) 225-2400
                                        Fax:    (617) 225-2480
                                        Email: jdf@pingitorelaw.com

Local Rule 7.1(A)(2) Certification

     I certify that I have conferred with opposing counsel and attempted in good faith to resolve or narrow the issue presented by this Motion.

Dated: May 12, 2010                          /s/ John D. Fitzpatrick

Certificate of Service

     I certify that on this date I served a true copy of the foregoing by first class mail or ECF upon Marjorie Sommer Cooke, Esq. and Kevin W. Clancy, Esq., Cooke Clancy & Gruenthal LLP, 265 Franklin Street, Boston, MA 02110 .

Dated: May 12, 2010                          /s/ John D. Fitzpatrick